The District Court's judgment should be reversed because a reasonable jury could find that Ripple made a separate offering of XRP investment contracts in 2017 that triggered the repose clock for that offering. Under the Governing Murphy test for a separate offering, a reasonable jury could easily find that the 2017 offering was different from what came before. In 2017, Ripple for the first time targeted unsophisticated investors to develop a liquid market to support a new cross-border payments platform. But XRP had a major supply-side problem. Ripple was free to flood the market with the 80 billion tokens in its treasury. That massive overhang destroyed liquidity, volume, and price. XRP traded for only about half a penny. Then in 2017, Ripple suddenly transformed the market by changing the number of XRP that could be sold and told investors when it did so that, quote, things have changed. That's Ripple's market report at 4ER771. To solve the overhang, Ripple locked up its treasury into tranches of one billion XRP. Each month, one tranche would become available for sale on a regular supply schedule. Counsel, we know the facts. So I wanted to ask you if we determined that there was a public offer as of 2013, the statute of repose borrows the claim. Is that correct? No, that's not correct, Your Honor.  Because the text, context, and purpose of the statute all indicate that a separate offering starts the repose clock. And I'd like to take each of those features of it.  Let me then ask you this. If we determine that the offering in 2017 was not a separate offering, does the statute of repose borrow the claim? No, Your Honor, because an offer of a different security would start the repose clock, too. And a reasonable jury could find that there was an offering of a different security here. And just to be clear on that, so if Person A bought a unit of XRP in 2015, and Person B bought a unit of XRP in 2017, after what you're calling the different offering, and then they meet up in 2018 and compare their holdings, is there any difference in what they have? They both have a unit of XRP, and isn't it exactly the same? At that time, it is the same. But I think there are two important distinctions here, Your Honor. First is that the XRP in 2017 or 2018 was fundamentally altered from the XRP before then, because Ripple had to change the software in order to alter the properties of XRP to facilitate this restricted supply schedule. You can think of that software like a charter for XRP. It said what types of transactions could be performed with it. And before this restricted supply schedule, you could not lock up XRP and then schedule it to open to become available for sale on a later date. But did that change in software change any of the rights that an investor would have to buying this XRP token? It would, Your Honor. It would change their right to perform certain transactions with the XRP. But that's really— How so? Well, because before 2017, you couldn't create these types of restricted wallets or restricted accounts that then would open up. And that completely changed the economic landscape of XRP. Price increased 30,000 percent. Volume increased 20,000. I understood the escrow argument to be that it was—that the wallets themselves would be released on a monthly basis and if not used, then taken back up. How would that affect an individual user, you know, person A purchasing XRP? How would that affect their ability to transact or trade the token? In three ways, Your Honor. First, those individuals could also create their own escrowed accounts. So they could—those individuals could also perform different types of transactions with XRP. The second way is that it had a profound economic effect on the XRP market itself. It made it into a saleable asset for retail investors. You can think about it like Amazon authorizing 100 billion treasury shares. And then one day Amazon says, we're going to take 90 percent of those shares off of the market and instead only authorize 1 billion shares to be made available for sale on a month-to-month basis. That changes how the economic reality of the security works for investors. But why—so I take the point that it might change the economic reality, but why would that make it a new offering or a different security? Because if that were—if you think about it, a company that goes and does things in order to change the share price of stock, you know, maybe it makes good decisions, bad decisions, and it changes the price of the share. Would that become a new offering when you sell that security again? It would depend, Your Honor. Murphy is the controlling test whether—well, sorry, whether it's a different security. Or an offering, either one. So I'll take the offering question first because that's really our principal position here, that it didn't have to be a different security. I mean, it would change the offering because—well, it would depend. It would depend on whether it changed—there was a different plan of financing, a different purpose, a different class of securities. Just minor marketing changes aren't going to be enough. But that's not what happened here. Ripple told investors that this was a sea change, that it was a paradigm shift. That's at ER 772. A reasonable jury could credit Ripple's own representations to the public that this was something completely different and could discredit Ripple's post hoc litigation position that it was all part of one continuous offering. So Murphy relates to separate offerings and whether one should consolidate in order to provide for an exemption or anything else. Do you have another case to offer that says you have a security marching along and it has a certain value and if the company does something to it to change that value, it becomes a new security or a new offering? What's your best case for that proposition? So I think the shelf offering context is analogous. So in a shelf offering, a company authorizes or issues a certain number of shares and puts out a registration statement that says this is what our offering is going to consist of and then proceeds to sell onto the market on a continuous or a delayed basis. Now under the regulations, Section 229.512, you have to file a new amended registration statement if you do one of two things. If there's a fundamental change in information that investors would use to evaluate the value of the security or if there's a material change in the plan of distribution. What case are you relying upon that you say embodies this analysis that you're giving us? What case can we look to? For the shelf offering analysis, Your Honor? Uh-huh. Sure. So these aren't cited in our brief because we don't make the shelf offering analogy in our brief, but I could point you to two different cases. If it wasn't made in your brief, it's probably not fair game. Sure. I mean, I think we're just kind of exploring whether or not this shelf offering, whether if the court were to decide a different test than Murphy was appropriate, the shelf offering context would be where to look. I mean, we think that there is an antecedent legal question here. Does a separate offering of the same security start a new repose clock? The answer to that is yes, and I'd like to explain why in a second. Murphy is the controlling test for whether an offer is continuous or separate. Ripple argued that below and is abandoning that position on appeal because its argument under Murphy is so weak. But if this court were to decide that Murphy is inapposite to this context and that some other test would apply, we think we would win under any test because Ripple's representations to the public and internal documents all show that this was a sea change and a paradigm shift. Did you argue before the district court this argument now that there was a new offering of security in 2017? Yes, Your Honor. That's at pages 274 to 276 of the brief at — or, sorry, of the second volume of the record. And I think there's an important footnote, too, at 268, note 5, where we argue that the escrow specifically fundamentally altered XRP. But I do just want to — But in the context of it becoming a new offering? Yes, Your Honor, that it was a separate offering under Murphy. I mean, I think those are really the same thing, whether it was a separate offering under Murphy or a new offering. And I do want to have you get to the repose point that you wanted to make. But before we get there, it seems that this argument is somewhat inconsistent with what the arguments were being made for for class certification because if the whole escrow plan was what fundamentally transformed this into a new offering, how does that align with the arguments that, you know, this should be related back to the Greenwald or to other things where there are common questions as to whether XRP was a security earlier in 2017? Those seem to be a little bit inconsistent because, as I understand it, the escrow plan didn't get put into effect until December of 2017. So I think there are three things in your question, Your Honor. So first, on whether the class that was ultimately certified is consistent, it is because it's after the escrow announcement. The district court ultimately certified a class from July 3rd, 2017, which is within the only people who would have live claims under the statute of limitations based off of the Greenwald complaint. I guess I'm a little less concerned about when the court certified the date but more the nature of your client's arguments, which is this thing with a security and there are common questions whether this was a security as of early 2017 versus this became a new offering or a new security based on the escrow changes in late 2017. Right. So to be clear, our position isn't that it was in late 2017. Our position is that the relevant date is May 16th, 2017 when the escrow announcement was made. I mean, the parties haven't joined issue on what the one specific date would be because all of the potential dates are within 2017. We do think that there is one specific date and that is May 16th, 2017 when the escrow announcement happened. The class cert period—and just to respond directly to your question, I don't think that there is an inconsistency between saying whether XRP is a— whether there is a common question as to whether it is a security. I don't think that that's inconsistent with saying that there was a new offering that occurred on May 16th, 2017. I do just want to briefly, to tie up my previous answer, to say that if the Court were to decide that Murphy is not the right test, we do win, I think, under any conceivable test for when a new offering would begin, but the right move would be to remand to the district court to apply that test in the first instance. I do want to, though, explain in more detail why the statute starts from a separate offering. The text, the context, and the purpose of the statute all support that conclusion. And that's how the Supreme Court read the text in CalPERS. In CalPERS, the Court said that Section 13 bars a claim more than three years after the offering upon which the claim was based. And the Court separately said that the claim has to be brought within three years of the relevant offering. And it would make a hash of Section 13 to understand that one single phrase in the statute that controls both Section 11 and Section 12A1 as having opposite meanings, each offering in the Section 11 context and only the first-ever offer in the 12A1 context. And as we say in our brief, Congress knew how to set a first-date-ever rule. It did so in Section 4A3. The rule that Ripple is arguing for here is one where an issuer would have future immunity for violations that have not yet occurred based on trickling a security into the market at low volume in venues that the ordinary public doesn't have access to, and then years later saying, we are making a... Well, that seems to go maybe more to the question of whether it was bona fide offered to the public than to the question of whether there's a new offering. So I'm not sure. I understand the relevance of low volume, not well publicized, to like was there an offer in the first place, but I'm not sure how it fits into the Murphy analysis. Right. I think I'm just making a more general point about the investor protection purpose of the statute, that the point of the statute is that there is an unregistered security claim for each unregistered offering, and that if you could trickle out a security for three or four years and then make a huge public offering, you would effectively be able to profit on making a fundamental economic change to your distribution without ever facing private enforcement actions, and that's not how Congress designed the statute. So, Counselor, am I correct in assuming that your argument is a trickle cannot be an offer? No, Your Honor. I thought that's what you argued, that you can make a trickle and then make an offering. So it seems to me you were making a distinction between a trickle and an offering. So, right. We don't think that the trickle was a bona fide offer within the meaning of the statute, but the point I'm trying to make here is simply that Congress did not intend and did not design Section 13 to function in such a way that an issuer could make one type of offering, in this case a trickle, for three years and then say we are actually going to impose a new supply-side restriction mechanism to take 90 percent of the security off of the market, increasing price by 30,000 percent and volume by 20,000 percent for the new purpose of targeting a new audience of investors. And just to be sure, I think Judge Sanchez asked you this question, but I want to be sure I understand your answer. Did the escrow announcement alter the rights of existing XRP holders? So I think two things in your question, Your Honor. I don't think that it created a new security for people who had already purchased it. What Warfield says is you are looking at whether the transaction is an investment of money in a common enterprise with an expectation of profits for others. So I don't think that there was a transformation of what was held by people who purchased in 2013. But the second thing is that the economic change that happened here had a massive effect on the types of products that Ripple was able to bring to market and that people would be able to use and to enable appreciation of. But then I guess, and I think you were asked this before too, but I'm still not sure I understand how that's different from just a company selling stock. And in the first couple of years of selling stock, it's not a very good company and has few prospects. And then at some point in that period, it develops a very profitable new product, and now the stock is worth a lot where it wasn't before. That doesn't transform it into a new offering if they're just selling the same kinds of shares that they were selling before. It's not clear to me why this is different than that. Well, I think that would under Murphy potentially. I mean, if they were making an offering for the purpose of supporting a new product that didn't exist before, then potentially a reasonable jury could conclude that there was a new offering, but that's not all that happened here. Ripple changed the number of shares that were available by offering them suddenly from discrete tranches. That is a new offering for which you would have to file a new registration statement. That's what Ripple told the SEC at 8 ER 1730. They said, our offerings are episodic, and we'd have to file a new registration statement. A reasonable jury could credit that. This is not a case where Ripple suddenly, like, becomes a better company and its stock becomes more valuable. All the evidence that the district court bypassed showed that Ripple made intentional changes to its method of distribution and that that caused an order of magnitude economic difference for Ripple. But that's what Ripple's internal documents say, and that's what it told investors, that it was a sea change. So I'd like to reserve the rest of my time for rebuttal unless there are further questions. Of course. Thank you, counsel. Thank you. Before you leave, I just want to ask you one question. Is the statute of repose issue the only issue before us? No, Your Honor. In your view, what are the other issues that are before us? So Ripple has the alternative argument that they're not a solicitor. Oh, but I mean in terms of the cost and the exclusion of the expert and the class certification. Would you agree those are not before us? No, we don't agree, Your Honor. If by not before us, you mean that whether or not the court has jurisdiction over those? No. Okay. We think the court does have jurisdiction. Oh, you do? You think that was included in the certification order? Yes. I mean, I can give you like a 30- That's okay. Okay. I just wanted to know. Oh, go ahead. That just brought up something. Do we need to reach the question whether XRP is a security in order to resolve this case? No. I don't think so. I mean, I think that the question of whether XRP is a security is intertwined with the repose question on the basis of some of our alternative theories that we've presented. You know, if the court were to reject our position that it is a, you know, offer of the same, a different offer of the same security and that it's a different security and were to reach our argument that it wasn't a security before 2017, I mean, I think it would be enough for the court to just say there's a material dispute about whether the statements linking Ripple's efforts to profits were widely enough distributed. I think that would be enough on that particular issue. But I do think, you know, to be candid, that at that third stage, which we don't think the court needs to reach, that there is some intertwinement. All right. Thank you.  Good morning, Your Honors. Good morning. I'm sorry, Your Honor. I said good morning. Oh. Good morning. Gregory Rappoe for Ripple Labs. And may it please the Court. XRP was bona fide offered to the public within the meaning of Section 13 no later than June 2015. Therefore, the repose period ended no later than June 2018 and the class's claims against Ripple are time barred. There are essentially two theories, three if you count bona fide public offering, but I think two principal theories on which Mr. Sostak challenges that ruling. One of them is what I think of as the new investment contract theory where he says the Howey factor has changed. And the other is the separate offering theory on which he says that the Murphy factor has changed. I think analytically those are different and they're in a different procedural posture. But before you get to those, could we talk a bit about whether there was, in fact, a bona fide public offering in the first place? And maybe focusing on the XRP ledger. As I understand it, you have information about the number of wallets and the number of trades with those wallets. Did you provide any evidence of the number of actual people who were purchasing XRP from the XRP ledger and what, if any, their relationship was to the company? We can't name the owners of individual wallets because no one can do that, Your Honor. But we did provide evidence that there were individuals discussing XRP sales in public fora in 2013 and 2014. And there's no suggestion that those people were related to Ripple. We provided evidence that XRP was publicly traded on the digital asset exchanges. I'm not talking about the on-ledger trades now, but the Poloniex, the Kraken, the Bittrex trades. And those are the same types of trades that Mr. Sostak alleges are offers to the public. In fact, he himself purchased XRP for Bitcoin on Poloniex in 2018. So we offered evidence that you could do the exact same thing in 2014. But those weren't offers. I mean, those seem to be potentially different because those aren't offers by you. They're transactions between third parties, right? So I don't think that's required, Your Honor, because I think that the bona fide offer date for an unregistered security is when trading begins in the security. And I'd cite the court to the pink sheet cases like Kubik and Laser Arms that are in our brief, where when you have, in those cases, this was before digital assets, but you have a national quotation service publishing the quotes, that's sufficient to tell that there's been a bona fide public offer by that date. But I can also— I guess the concern here, and one of the amicus briefs sort of elaborates on this, is if you sort of imagine taking it out of the crypto context, a company selling stock and they sell it to anybody who comes by, as long as they go to the door in the basement and knock three times between midnight and 2 a.m. and a bunch of people who they've told know that and go and buy it, and they carry that on for three years, and then after the expiration of three years, then they take out an ad in the New York Times and start selling it to widows and orphans. And so I think the concern is that the position that you're advocating for seems like it would allow people to do that. So maybe you can address that. So I think that the test is whether the offer was genuine, and I believe that the Second Circuit's decision in Peastole that distinguishes a genuine from a sham offer is the right one to apply. And I think that in this case we don't have that sort of, you know, only knock between 12 and 2 type of situation that Your Honor is suggesting because Ripple published on its website that it was giving the XRP away to users, that it was selling it to market makers, that it was giving it to developers. And I'd point, Your Honors, there's a passage at 7 excerpts of record, 1401 to 1412, and then 1404 is maybe the best one for my purposes where it talks about distributions to users because, quote, everyone needs a small amount of XRP, and then distributions to, quote, market makers because, quote, liquidity is incredibly important. So you could have, I mean, maybe you couldn't find it in the New York Times, but you could run a Google search. And then what do we do with the fact that we have statements from the company in 2016 saying we don't sell it to consumers and the e-mail from Mr. Bias in 2017 that, you know, there aren't tools to buy it, no clear signs of its use by anyone? I mean, doesn't that at least create a factual question as to whether this was genuinely being sold to the public? I don't think it was, Your Honor, because I think if you follow those sites back to the full context in the record, they wouldn't support a reasonable jury in drawing that inference. So, for example, let's look at the quotes from the CEOs, Mr. Larson and Mr. Garlinghouse, that Ripple did not sell XRP to the public. He cites those at 2ER271. But the same CEO testimony, if you read a little bit further on, they do testify specifically that there were sales to market makers, and the market makers were out there selling to anyone who would buy, and they talk about the giveaways, and the giveaways were going to anyone, and then those people could resell it as well. But would that be to the public if the market makers are financially sophisticated? So Mr. Sostek's position is that the market makers were Ripple's execution agents and that they were selling onto the public. And so when we challenged whether he ever bought XRP directly from Ripple, he pointed to sales by the market makers and said they're selling on behalf of Ripple, they're Ripple's agents, therefore I bought from Ripple. Now, whether we would agree at the merit stage whether they're agents or not, that's maybe a separate question, but for purposes of summary judgment, the district court was entitled to look to Mr. Sostek's version of the case and to those representations that he's made that the sales by the market makers were sales by Ripple for statutory purposes. To me, the clearest example of what might be a bona fide offer is the sale on the XRP ledger itself, because at least that seems to be something where there's something more offer-like as opposed to just things showing up by other parties on digital exchanges. Yes, Your Honor, absolutely. And in connection with that, I'd also like to point you to the evidence in the record about first the Ripple client and then the Ripple trade apps that allowed, quote, anybody who was interested to, quote, access the XRP ledger and ellipsis have a wallet. So that's five excerpts of records 855 to 857, and then there's some further discussion in the depositions in seven excerpts of record 1329, 1336, and then starting at 1478. So Ripple made an app to go out there and allow people, people who wanted to could use that app to buy it. The argument on the other side is not that these – oh, and I should also point to Mr. Sostek's own admission and discovery that, quote, some members of the public could purchase XRP on cryptocurrency exchanges before July 3, 2015. Supplemental excerpts 258, excuse me. And I also would challenge, if I may, the premise that it has to be a sale by Ripple directly. Because if Ripple – you know, if you have a situation with a traditional stock where the issuer sells to the underwriter and the underwriter sells to the public, there's no doubt that at the time the underwriter is selling, that's a bona fide offer to the public. Now, we're not arguing that there are underwriters here, but I think that's enough to show that the issuer doesn't have to make direct sales as part of the offering for the offering to be a bona fide offer to the public. The correct test is whether members of the public could go out there and by doing something as simple as running a web search, you know, find out how to buy this stuff and then buy it if they chose. And I also want to point to the little – the XRP forum chat post that Mr. Sostek relies on because I think that's one that needs some more context, too, where there's a statement that Ripple doesn't sell to consumers. That's at 4 excerpts of record 779. But if you read on, it says, but go to xrpchat.com. There's easy directions for purchasing XRP there. So the contention that that was – that a reasonable jury could instrue that as saying, oh, it's not available to the public, it hasn't been offered to the public, I think is a little strained. So then can you address the argument about a new offering in 2017? The new – okay, a new offering as opposed to a new security. So the Murphy version of the argument or both? Feel free to tackle both. I think the offering one might have more traction than security, but go ahead. I'll start with the separate offering theory. So first, on the statute, Section 13 is inconsistent with the argument that later offerings restart the repose period. The statutory language starts the period when the security was bona fide offered to the public, and it doesn't say anything to suggest that a later offering would restart that date. And the Murphy case, which has been relied upon, addresses integration of offerings for registration purposes. It says nothing about repose, and I think the Fourth Circuit's analysis in the Kavanagh's case that we've cited in our brief, saying that it really – I'll paraphrase, but you can find the full quote in our brief – that the Murphy factors have nothing to do with the statute of limitations is persuasive, and this Court should follow it. But even if you – oh, then the argument's been made that we – this is inconsistent with our position in the district court. I don't agree with that. At the summary judgment stage, we argued that on the facts, the Murphy factors were – did not support a separate offering, and I still agree with that, and I'll get to that in a moment. But at the motion-to-dismiss stage, when this issue first came up, we argued even if the Court accepts that defendants made ongoing multiple offerings, the statute of repose would still bar plaintiffs' claims because the statute of repose begins to run on the first such offering. That's supplemental excerpts of Record 859. That's the exact claim that Mr. Sostak has alleged that we never made or that we somehow abandoned or that we gave up, and it's right there in the record that we made it. So can you address the argument that because of Ripple's escrowing and changing the value of XRP in a really fundamental way that the sales amounted to a new offering? So first I want to point out that – Not about whether repose would apply or not, but just is that even a new offering? Right. So we would argue that it's not because XRP is fungible because you could – At the time that – right after the escrow was announced, whether you want to count it from the date of the announcement of the escrow or after the escrow was implemented, there was no difference in value between a piece of XRP being held, a unit of XRP being held by somebody who bought it in 2013 or 2015 and somebody who just bought it after the escrow was announced. There was also no difference between what the two of those people could do with their XRP. It's true that the point was made that the escrow amendment added new functionality to the ledger so you could make escrow contracts after that point, but everybody could make escrow contracts after that point. And it was always contemplated that the XRP ledger would develop. That was not something new. It was open source. Ripple has never controlled it. Changes have been made to the XRP ledger over Ripple's objection. This particular change Ripple did advocate for, but it wasn't a fundamental change in the concept that we're going to have this XRP ledger and we're going to have this technology that will allow cross-border payments. Cross-border payments were part of the deal from very early on. We've cited evidence in our brief. I can give you record sites if you need them. But what about the argument that Ripple would have to create a new registration statement that incorporated this new information about the escrowing and other important things? I mean, that's the argument, that we would have to do that. And it's even suggested that we said to the SEC that we would. But what we really said to the SEC is the reason it makes no sense to treat this asset as an investment contract is because we constantly have to be re-registering it because we're constantly changing what we're doing with it. The whole point of this is that it's an innovative technology. And it's not just that. It's not just that we'd have to make the changes. It's that we wouldn't know when we'd have to make the changes because Mr. Sostak's position to this court is you need a jury to tell you, not that it definitely was, not that you could tell in advance that it was, but you need a jury to tell you whether the announcement of the escrow or the implementation of the escrow or maybe some other combination of factors constitutes the offering of a new security. And on that theory, how could anyone who was trying to operate in this industry, and this is a valuable technology that has done a lot of good for the world, how could anybody who was trying to operate in this industry ever know the precise date on which some plaintiff might later allege, oh, that's when you should have made the new public offering? And that, I think, Your Honor, takes me back to the inconsistency point and the argument about the theory on which this claim was pressed at class certification and on which class certification was obtained is fundamentally inconsistent with the argument of an ever-changing investment contract where only a jury can tell you which facts are enough at any given point in time. Because at that class certification stage, the argument was made to the district court that there would be, quote, identical evidence, end quote, for every class member, that's supplemental excerpts of Record 830. And that includes sales. At that time, they were seeking a class that went back to May 3rd, so that's before the escrow was even announced. The evidence was going to be identical at May 3rd, and then the evidence was going to be identical in, let's say, June, after the escrow was announced. And then it was going to be identical in 2019 after the escrow was implemented and also identical, I think, in 2020 after Ripple stopped even making direct sales on the ledger, if that mattered. But at that time, the theory that Sostek committed himself to was this is all the same, it's all fungible, it's all interchangeable. And he did that so that he could prove whether it was a security on a class-wide basis. And I think that fairness and also good judicial administration strongly suggests that the district court should not be reversed for taking his word and saying the question in this case is whether XRP is a security. That was his phrasing at that time. He's abandoned it now, but that's what he's said many times. We've cited the examples in our brief. Whether XRP is a security, okay, then when was XRP bona fide offered to the public? That was a reasonable, a correct way to decide this case. It should not be overturned on the basis that on appeal for the first time, he's embraced the idea that the investment contract is ever-changing. I'd like to spend a minute on the privity argument, if that's... Counsel, do you agree that the cost issue, the exclusion of the expert, is before us? No. No, we think the court has no jurisdiction over that. It's not, I mean, I don't think it could have been certified. I don't think it was certified. Actually, those are the two things. Don't think it could have been, don't think it was. Even it would have been an interlocutory order, not subject to Rule 54B, and it wasn't in the actual Rule 54B order that was entered. Right. On the privity argument, this is an alternative ground for affirmance that you could also affirm on the basis that members of the class did not purchase XRP from Ripple. And under footnote 21 of Supreme Court's opinion in Pinter v. Dahl draws the distinction that we think is relevant here, that Section 12 does not permit recovery from a seller's seller. And in response to that, Mr. Sostack has cited the Pino case. And I think that Pino is a very different situation in which you had people who were, in fact, buying from the issuer, but they were being urged to buy from the issuer directly by Mr. Cardone, one of the defendants in that case, who was essentially acting as an agent for the issuer because he owned and controlled the issuer and stood to make money. And he was out there on social media saying, I am offering investment opportunities. Well, then it might be fair to hold him to having been the one who offered the investment opportunities for purposes of Section 12 on the reasoning in Pinter that the question is whether the buyer could have reasonably thought that in ordinary usage they were buying from this person. But when you have a situation here where most of the class's purchases, the vast majority of the class's purchases were going to be on blind bid-ask trades on exchanges with no evidence whatsoever of any connection with Ripple, with no knowledge of the counterparty's identity, to say that on a solicitation theory you can support the idea that these people are buying from Ripple, I think is taking it a step too far. And if the Court has no further questions. Let me ask you what I asked counsel before the end of his argument. Do we need to reach the question of whether XRP is a security? I think I know what your answer is going to be, but why don't you answer it. My answer is definitely that you do not need to reach that question. I do think you should assume and affirm the district court's assumption that XRP is a security because that's the basis on which Mr. Sostak argued the case. But I don't think you should attempt to answer on this record and on this briefing whether XRP is a security or whether investment contracts were sold at all. That would be for the trial if there was a trial. But we don't need to have a trial because the claims are barred by Ripple. All right. Thank you, counsel. Let's have two minutes for rebuttal. My friend's presentation reflects that there is a fact dispute about whether XRP was bona fide offered to the public before 2017. Ripple's executives, both of their CEOs, testified that Ripple did not sell to the public. Ripple's corporate representative testified that the public had recognized that the public could not have known that XRP, that Ripple was selling programmatically before it disclosed that to the public. Mr. Villas testified that the ledger was so complicated that he could not figure out how to transact on it. The only evidence that my friend offers in rebuttal is really that you could make wallets on the ledger. But the fact that you could make an account to trade doesn't mean that it was possible for an ordinary investor to transact in XRP before Ripple started its push to target retail investors in 2017. Ripple's VP of marketing said in August of 2016 that there was no easy, convenient way to buy XRP today. A reasonable jury could credit all of those internal and external statements. I do want to emphasize that fungibility does not matter for purposes of determining whether there is a new offering. You have to register an offering of a security if you are making a new distribution, even if it's the same security. And in 2017, Ripple made a new distribution of XRP through these separately locked up escrow tranches. So it's irrelevant to the Murphy analysis, I think, whether or not one person who bought in 2015 by 2017 had the same XRP as other people. What matters is whether the economics of this mode of distribution was the same. And there was a difference. Ripple solved the overhang problem. It took 90 percent of the shares off of the market, packaged them into discrete tranches, and then started selling to the public, which increased price by 30,000 percent. It would have needed to file a new registration statement for that. That's a new offering. The repose clock for SOSX claims starts then. Thank you. Thank you. Thank you to both counsel for your helpful arguments. The case just argued is submitted for decision by the court, and we are adjourned.
judges: RAWLINSON, MILLER, SANCHEZ